# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

OLGA PINSKY,

     *Plaintiff*,

     *v.*

NANCY A. BERRYHILL, Commissioner of Social
Security,

     *Defendant*.

No. 3:17-cv-524 (MPS)

## MEMORANDUM AND ORDER

Olga Pinsky filed this appeal of the Commissioner of Social Security's decision to deny
her application for Title II Disability Insurance Benefits. Under 42 U.S.C. Section 405(g), she asks
this Court to reverse the decision of the Commissioner because it was not supported by substantial
evidence or, alternatively, to remand for rehearing. (ECF No. 16.) Because I find that Pinsky's
legal arguments lack merit and that the Commissioner's decision was based on substantial
evidence, I deny Pinsky's motion to reverse or remand and grant the Commissioner's motion to
affirm.

## I.    Background

### A.  Factual Background

The parties stipulate to the following medical chronology. (ECF No. 16-1.) In 2011, Olga
Pinsky was 27 years old and had a history of mental health treatment for anxiety and depression.
(*Id.* at 1.) On January 13, 2011, she had a comprehensive assessment for mental health at Catholic
Charities. (*Id.* at 1.) She had survived the Chernobyl disaster as a child and had experienced
difficulties integrating into life in America. (*Id.*) She reported sleep disturbance, panic attacks,

1

obsessive thoughts, and compulsive behaviors. (*Id.*) The intake clinician at Catholic Charities reported that Pinsky was cooperative and that she had coherent thoughts and an intact memory. (*Id.*)

On April 9, 2012, Pinsky saw Dr. James Sarnelle, a general surgeon, following several weeks of right groin pain. (ECF No. 16-1 at 1.) She stated that the pain had started recently, while she was studying abroad for three weeks in Europe. (*Id.*) She had a negative computed tomography (CT) scan of her pelvis and abdomen. (*Id.*) Dr. Sarnelle found that the etiology of Pinsky's pain was unclear. (*Id.*)

On October 30, 2012, Pinsky had an MRI of her brain, because she was experiencing dizziness, vertigo, and fever. (ECF No. 16-1 at 1.) The MRI found that there was a single punctate focus of white matter signal abnormality, but no other evidence of abnormality. (*Id.*) She also had a magnetic resonance angiography (MRA) of her neck, which was normal. (*Id.*)

On October 31, 2012, Pinsky had a medical appointment with Dr. Eric Kung, at which she complained of headaches and dizziness. She reported debilitating headaches, one to two times per month, that lasted for 24 hours. (ECF No. 16-1 at 2.) On examination, Pinsky was neurologically intact: she had a full gait, intact reflexes, normal sensation, and full muscle strength throughout. (*Id.*) Pinsky was pleasant, alert, and fully oriented. (*Id.*) Dr. Kung diagnosed migraine without aura, without mention of intractable migraine, and without mention of status migrainosus. (*Id.*) He prescribed Amitriptyline and Tizanidine for Pinsky's headaches. (*Id.*) Dr. Kung also diagnosed depressive disorder, not elsewhere classified, and Lyme disease. (*Id.*)

On November 15, 2012, Pinsky had another appointment with Dr. Eric Kung. She described headaches with intense pressure, throbbing, pulsating, and squeezing pain on the level of 8.5, with radiation to the temporal area, with vertigo, nausea, and low-grade fevers. (ECF No.

16-1 at 2.) Dr. Kung noted that a November 8, 2012 computed tomography angiography (CTA) of Pinsky's head showed sinus disease but was otherwise unremarkable. (*Id.*) An MRI of Pinsky's cervical region was also normal. (*Id.*) On examination, Pinsky was neurologically intact. She had a full gait, intact reflexes, normal sensation, and full muscle strength throughout. (*Id.*) Pinsky was alert and fully oriented. (*Id.*) Dr. Eric Kung diagnosed migraine without aura, without mention of intractable migraine or of status migrainosus. (*Id.*) He advised Pinsky to stop Amitriptyline and Tizanidine and recommended a spinal tap for evaluation of chronic fatigue syndrome. (*Id.*)

On February 27, 2013, Dr. Irene Nasaduke, Pinsky's treating physician, wrote a letter requesting a neurological consultation for Pinsky. (ECF No. 16-1 at 2, R. at 447–48.) Nasaduke stated as follows: She wrote that Pinsky first developed depression at the beginning of high school after being bullied. (*Id.*) She had taken Wellbutrin daily since 2009, but medication had had no effect of her chronic fatigue. (*Id.*) In February 2010, Pinsky had complained of becoming short of breath after climbing one flight of stairs. (*Id.*) In June 2011, Pinsky had complained of severe nonstop headaches, which she would have for three or four days at a time and which were not alleviated by Excedrin. (*Id.*) Pinsky had had blood tests for CBC, ESR, SMA-15, HgA1c, TSH, free T4, vitamin 12, folate, and rapid plasma regain (RPR). (*Id.*) As of February 2013, Pinsky was less fatigued and able to walk one flight of stairs without shortness of breath. (*Id.* at 2–3.) In 2011, she had developed onset of chronic low-grade fever accompanied by fatigue. (*Id.* at 3.)

On March 4, 2013, Pinsky had an evaluation for chronic fatigue at Yale Department of Neurology. (ECF No 16-1 at 3.) Her neurological exam at this time was normal, and she had a normal gait, intact reflexes, and full strength throughout, but it was noted that she may have true Epstein-Barr virus-related chronic fatigue syndrome and that she did appear to have comorbid sleep disorder, anxiety, and depression. (*Id.*) Pinsky was alert and fully oriented with a normal

fund of knowledge. (*Id.*) Pinsky reported an onset of symptoms around 2007, beginning with extreme fatigue. (*Id.*) Since that time, she had had good periods and bad periods. (*Id.*) Since the summer of 2012, she had been having a bad period. (*Id.*) She would wake up from eight hours sleep without feeling rested. (*Id.*) She had some insomnia. (ECF No. 16-1 at 3.) Her fatigue interfered with her ability to function. (*Id.*) She had difficulty going to class and doing school work due to fatigue. (*Id.*) At times, she would stay in bed for most of the day due to fatigue. (*Id.*) She had loss of energy, as well as daytime sleepiness, although those were two separate issues. (*Id.*) She had some difficulty with words when she was anxious. (*Id.*) She had vertigo, especially when changing positions, as well as a bilateral hand tremor. (ECF No. 16-1 at 3.) On physical examination, she was positive for photophobia, malaise and fatigue, shortness of breath, nausea, and dizziness, weakness, speech changes, depression, and environmental allergies. (*Id.*, R. at 353.)

On April 10, 2013, Pinsky underwent a sleep study to determine the cause of her daytime fatigue. (ECF No. 16-1 at 3.) Her sleep efficiency was decreased to 79.4%, but the rest of her sleep study was essentially normal, and there was no evidence of clinically significant sleep disordered breathing. (*Id.*, R. at 377.)

Between May 22, 2013, and August 27, 2013, Pinsky engaged in intensive outpatient therapy at St. Vincent's Hallbrook. (ECF No. 16-1 at 3.) She was diagnosed with generalized anxiety disorder and described a long history of significant anxiety, which had been most recently triggered by school-related stress. (*Id.*) She reported that her anxiety was preventing her from running errands and decreasing her level of focus and concentration, which in turn was having a negative effect, and, as a result, she was becoming increasingly overwhelmed by her school workload. (*Id.*) Pinsky had good participation in groups, but her attendance was sporadic, and she missed multiple scheduled treatment days. (*Id.* at 3–4.) She reported that she had symptoms of

4

chronic fatigue syndrome and said that she was struggling to function and could not make the program consistently. (*Id.* at 4, R. at 368.) Dr. Mikhail Magid, Pinsky's psychiatrist, assigned a global assessment of function (GAF) score of 51.[1] (ECF No 16-1 at 4.) Dr. Magid reported that Pinsky was cooperative, alert, and fully oriented and that she related adequately. (*Id.*, R. at 368.) He also reported that Pinsky denied any hallucinations, violent thoughts, or suicidal/homicidal ideations. (ECF No. 16-1 at 4.) He stated that she had fair insight and good judgment. (*Id.*) Dr. Magid advised Pinsky to continue her individual therapy with Lisa Gardner, Ph.D. (*Id.*)

Unspecified medical notes from August 17, 2013, state that Pinsky suffered from chronic fatigue disorder, Lyme disease, dizziness, migraine headaches, chronic head pressure, photophobia, memory deficits, arthralgias, and dyspnea on exertion. (ECF No. 16-1 at 4, R. at 460.) At that time, Pinsky said she had an inability at times to hold things in her hands, with a recent worsening of this condition. (*Id.*)

On October 1, 2013, Pinsky had a neurological consultation for chronic fatigue, Lyme disease, and headaches. (ECF No. 16-1 at 4, R. at 422.) At this time, Pinsky complained of severe exhaustion, insomnia, photophobia, headaches, bilateral hand tremors, short-term memory loss, and difficulty concentrating. (*Id.*) She reported migraines, blurred vision, and some slurring speech when she spoke rapidly. She experienced some vertigo when she got up quickly and stated that her balance had been off for the past year. (*Id.*) Dr. Evangelos Xistris, the neurologist, reported that

---

[1]The GAF scale rates overall psychological functioning on a scale of 0–100 that takes into account psychological, social, and occupational functioning. *See Zabala v. Astrue*, 595 F.3d 402, 405 n.1 (2d Cir. 2010). A GAF score between 50 and 60 is defined as moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

Pinsky was neurologically intact. (ECF No. 16-1 at 4, R. at 423). Pinsky had a normal gait, full muscle strength throughout, normal sensation, and intact reflexes. (*Id.*)

On October 3, 2013, Dr. Nasaduke completed a medical source statement. (ECF No. 16-1 at 4, R. at 373–76.) She had been treating Pinsky since February 4, 2010. (*Id.*) She reported that Pinsky's chronic fatigue disorder had worsened. (*Id.*) She said that Pinsky was fully oriented but that her memory and concentration were impaired. (*Id.*) She could not enunciate words when fatigued, and her judgment and insight were more labored than they were previously. (*Id.*) For the following statements, Dr. Nasaduke checked the corresponding boxes on a form:

- Pinsky had a very serious problem asking questions or requesting assistance and performing work activity on a sustained basis, eight hours per day, five days per week. (ECF No 16-1 at 5, R. at 374–75.)

- Pinsky had a serious problem using appropriate coping skills to meet the ordinary demands of a work environment, carrying out multi-step instructions, focusing long enough to finish assigned simple activities or tasks, changing from one simple task to another, and performing basic work activities at a reasonable pace and finishing on time. (ECF No. 16-1 at 4–5, R. at 374–75.)

- Pinsky had an obvious problem handling frustration appropriately and interacting appropriately with others in a work environment. (ECF No. 16-1 at 5, R. at 374–75.)

- Pinsky had no problem taking care of personal hygiene, caring for her physical needs, using good judgment, respecting/responding appropriately to others in authority, and getting along with others without distracting them or exhibiting behavioral extremes. (ECF No. 16-1 at 5, R. at 374–5.)

6

- Pinsky had a slight problem carrying out single-step instructions. (ECF No. 16-1 at 5, R. at 375.)

On October 9, 2013, Dr. Michael Bohnert, a state agency medical consultant reviewed the evidence and opined that Pinsky had a moderate restriction in activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (ECF No. 16-1 at 5.) Dr. Bohnert opined that Pinsky retained the mental capacity to understand and remember simple instructions and could understand, but could not remember, moderately complex/detailed instructions. (*Id.*) He also said that Pinsky could sustain the mental demands associated with carrying out simple tasks over the course of a routine workday/workweek within acceptable attention, persistence, and pace tolerances and was unable to sustain the mental demand for moderately complex/detailed tasks requiring sustained concentration. (*Id.*) Dr. Bohnert also opined that Pinsky could relate adequately with supervisors and co-workers, but could not sustain these same demands in working routinely with the general public, and that she could adapt to routine workplace changes as they relate to simple tasks and could remain aware of environmental hazards (*Id.*)

On November 1, 2013, Pinsky saw Dr. Evangelos Xistris, a neurologist, for complaints of chronic fatigue, Lyme disease, and headaches. (ECF No. 16-1 at 5). On examination, Pinsky was neurologically intact, and she had an intact gait, full muscle strength throughout, and intact reflexes. (*Id.*)

On November 12, 2013, Pinsky underwent an x-ray of her lumbar spine with a lumbar puncture with no significant findings. (ECF No. 16-1 at 6.)

On November 25, 2013, Pinsky complained to Dr. Samit Mahotra, a sleep specialist and neurologist, of trouble falling asleep. (ECF No. 16-1 at 6.) She reported that she would lie in bed and stare at the ceiling for hours. (*Id.*) She also reported that, although she had finished her Master's degree program the previous June, her sleep problems had worsened. (*Id.*) She further reported that she was depressed because she did not have "a job or a life." (*Id.*) She stated that she was in bed most of the time and that she did not get out of bed, although she was awake, because of severe exhaustion. (*Id.*) Dr. Mahotra reported that Pinsky was alert and fully oriented. (*Id.*) At this visit, Pinsky had a normal gait, full range of motion throughout, and was neurologically intact (*Id.*) Dr. Mahotra said that Pinsky had a normal mood and affect. (*Id.*) Dr. Mahotra diagnosed poor sleep hygiene and commented that Pinsky did not have a social life or job that forced her to wake up in the morning. (*Id.*) He also diagnosed delayed sleep phase syndrome and said that she did not have insomnia. (*Id.*) He advised her not to take daytime naps, unless she was about to drive, and recommended another sleep study if the symptoms continued. (*Id.*)

On December 5, 2013, Pinsky completed a behavioral health treatment plan. (ECF No. 16-1 at 6.) She described herself as depressed due to chronic fatigue syndrome, reported psychomotor retardation, and stated that she had problems going to sleep. (*Id.*) She said that her major problem was a lack of energy and that she had poor concentration and was indecisive. (*Id.*) She did not feel energized enough to socialize. (*Id.*) The intake clinician assigned Pinsky a GAF score of 55. (*Id.*) On December 12, 2013, clinician Terry Ann Gillin, LCSW, reported that Pinsky did not look sick. (*Id.*) Gillin said that Pinsky's energy level was high as she described her activities. (*Id.*) The therapist also said that Pinsky was somewhat cavalier as she described that her mother researched and contacted all her therapists, psychiatrists, and doctors. (*Id.*) Pinsky said that she was putting her Ph.D. on hold as she thought it was too much trouble to figure out how to transfer credits. (*Id.*)

A week later on December 19, 2013, Gillin reported that Pinsky was energized at her session. (*Id.*) Pinsky told Gillin that she had been out to dinner with family and had talked to her friends. (*Id.*) Pinsky also said that she had written a book of poetry that was published and sold 80 copies. (*Id.* at 6–7.) She also said that she had written 400 or 500 new poems, which she hoped to publish, and that she enjoyed photographing nature. (*Id.* at 7.) Pinsky's mother left a message for Gillin on December 27, 2013, which stated that Pinsky would not be attending therapy any longer. (*Id.*) Gillin discharged Pinsky from treatment after her voluntary withdrawal. (*Id.*)

On December 26, 2013, Lisa Gardner, another therapist, assessed Pinsky. (ECF No. 16-1 at 7.) Pinsky told Gardner that she crashed after getting her MBA. (*Id.*) Pinsky also said that she was always tired, that she had "brain freeze," and that her depression was getting worse. (*Id.*, R. at 731.) Gardner reported that Pinsky was cooperative and fully oriented. (ECF No. 16-1 at 7, R. at 732.) She observed that Pinsky was somewhat physically lethargic but also talkative and spontaneous. (ECF No. 16-1 at 7.) Pinsky had normal and clear speech. (*Id.*) Pinsky told Gardner that she "crashed" when she finished her MBA and had a "bad breakup" with her friend. (ECF No. 16-1 at 17, R. at 730.)

Lisa Gardner also completed a medical source statement, in which she wrote that she had treated Pinsky on and off for about 10 years and that she had treated Pinsky biweekly since December 26, 2013. (ECF No. 16-1 at 7, R. at 717.) Gardner wrote that Pinsky is unable to function outside of her home and that her condition is difficult to treat. (*Id.*) Gardner marked on a list that Pinsky had anhedonia or pervasive loss of interest in almost all activities, appetite disturbance, decreased energy, blunt, flat or inappropriate affect, feelings of guilt or worthlessness, generalized persistent anxiety, somatization unexplained by therapeutic disturbance, difficulty thinking or concentrating, unrealistic interpretation of physical signs or sensations associated with

9

preoccupation in her belief that she has serious disease or injury, psychomotor agitation or retardation, persistent disturbances of mood or affect, persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control or sensation, easy distractibility, paranoid thinking and inappropriate suspiciousness, emotional withdrawal or isolation, sleep disturbance, and a history of multiple physical symptoms for which there are no organic findings. (*Id.*, R. at 718.) Gardner wrote that Pinsky was markedly restricted in activities of daily living and extremely restricted in maintaining social functioning and in maintaining concentration and persistence. (ECF No. 16-1 at 7.) She wrote that Pinsky would have four or more episodes of decompensation in a 12-month period. (*Id.*at 7–8.) Gardner wrote that Pinsky would be expected to be absent more than four days per month. (*Id.* at 8.)

On January 7, 2014, Dr. Firooz Golkar, a state agency medical consultant, reviewed the evidence of record and opined that Pinsky could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability, other than shown, for lifting and/or carrying. (ECF No. 16-1 at 8.) The doctor also opined that Pinsky could occasionally climb ramps/stairs, occasionally climb ladders/ropes/scaffolds, frequently balance, and occasionally stoop, kneel, crouch, and crawl. (*Id.*, R. at 91.) He said Pinsky did not have any manipulative, visual, or communicative limitations and that she should avoid concentrated exposure to extreme heat and cold. (ECF No. 16-1 at 8.)

On January 9, 2014, Pinsky was discharged from Family Centers Inc.'s behavioral health program, because her mother left a voice message saying that the sessions were not helping Pinsky. (ECF No. 16-1 at 8, R. at 550.)

On January 15, 2014, Pinsky saw Dr. Lynda Street, an infectious disease doctor, for an evaluation. (ECF No. 16-1 at 8.) Dr. Street reported that Pinsky was alert and in no acute distress. (*Id.*) Dr. Street reported that Pinsky was cognitively intact, oriented, and had full strength, intact reflexes, and a normal gait. (*Id.*) She also said Pinsky was cooperative and had a full affect and normal mood. (*Id.*) Dr. Street said there was no evidence of active Lyme disease and did not suggest therapy for it. (*Id.*)

On January 16, 2014, Pinsky had an endocrinology consultation. (ECF No. 16-1 at 8.) At this time, it was noted that her multiple symptoms were difficult to attribute to a single medical condition. (*Id.*) Chronic fatigue syndrome and Lyme disease are among the possible diagnoses. (*Id.*) Her TSH was noted to be slightly higher than the ideal range, and it was noted that she had been exposed to radiation from Chernobyl. (*Id.*, R. at 670.) Dr. Antonio Pantaleo, the endocrinologist, reported that Pinsky had a normal physical examination and that she was pleasant. (ECF No. 16-1 at 8.) On January 24, 2014, Pinsky told Gardner that she had read a 629-page book in one weekend. (*Id.* at 9.)

On February 3, 2014, Pinsky had a follow-up with endocrinology for fatigue she described photosensitivity, vertigo, insomnia, hand tremors, extreme exhaustion, lack of energy, episodes of numbness throughout her body, short-term memory loss, poor concentration, and "brain fog." (ECF No. 16-1 at 9.) At this time, she was diagnosed with Hashimoto's disease. (*Id.*)

On February 4, 2014, Pinsky had a neurological evaluation for fatigue, memory loss, and hand tremor. (ECF No. 16-1 at 9.) She described anxiety symptoms that began in high school and that interfered with her concentration. (*Id.*) While in college, she began to have episodes of profound weakness, including marked weakness in her arms and legs, and she would find herself on the floor and unable to move for as long as three hours at a time. (*Id.*) She had over 50 such

episodes. (*Id.*) In 2007, she developed profound fatigue and saw a number of Lyme specialists. (*Id.*) In September 2012, she developed profound exhaustion with vertigo and short-term memory loss occurring intermittently. (*Id.*) In February 2014, she complained of memory loss and being unable to remember what her mother had told her five minutes earlier. (*Id.*) She repeatedly forgot appointments and had such profound fatigue that she spent most of her day in bed. (*Id.*) As of February 4, 2014, her physical examination was essentially normal, except that she had a very mild suspension tremor in both hands. (*Id.*) Pinsky was alert and neurologically intact. (*Id.*) On the Montreal cognitive assessment test, Pinsky's score was 29/30.[2] (*Id.*) She had normal sensation and an intact gait. (*Id.*)

On February 7, 2014, Pinsky saw Dr. Amiram Katz, a neurologist, for evaluation. (ECF No. 16-1 at 9.) Dr. Katz reported that Pinsky was alert and fully oriented with preserved higher mental functions on gross examination. (*Id.*) She had tenderness in her trapezius muscles with limitation in her neck range of motion. (*Id.*) Pinsky was neurologically intact with full muscle strength throughout. (*Id.*)

On March 10, 2014, Pinsky had a brain MRI, which was no different from her earlier brain MRI. (ECF No. 16-1 at 10.)

On March 24, 2014, Pinsky had an appointment for fatigue, memory loss, weakness, and shortness of breath. (ECF No. 16-1 at 10.) At this time, Dr. Louise Resor wrote that Pinsky continues to be "effectively disabled." (*Id.*) She complained of headaches three to four times per

---

[2] The Montreal Cognitive Assessment (MoCA) was created in 1996 by Ziad Nasreddine in Montreal, Quebec. It was validated in the setting of mild cognitive impairment and has subsequently been adopted in numerous other settings clinically. A score of 26 or over is considered to be normal. *Montreal Cognitive Assessment*, Wikipedia, https://en.wikipedia.org/wiki/Montreal_Cognitive_Assessment (last visited June 14, 2018).

month. (*Id.*) Pinsky said that she could not sit and that limited exertion, such as taking a shower, rendered her breathless. (*Id.*) She was noted to have chronic tachycardia. (*Id.*) On examination, Dr. Resor reported that Pinsky was alert with clear speech. (*Id.*) She had intact facial sensation, full muscle strength throughout, and intact reflexes. (*Id.*) She scored 29/30 on the St. Louis University mental status test, recalling 4/5 objects. (*Id.*)

On March 27, 2014, Douglas Rau, Ph.D., a state agency medical consultant, reviewed the evidence in the record and opined that Pinsky had a mild restriction in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no repeated episodes of decompensation. (ECF No. 16-1 at 10, R. at 102.) Dr. Rau opined that Pinsky was capable of adequate concentration, pace, and persistence for simple routine, repetitive tasks. (*Id.*)

On April 1, 2014, Pinsky complained of a racing heart and heart palpitations. (ECF No. 16-1 at 10.) At this time, Dr. Jeffrey Green described Pinsky's very sedentary lifestyle and days that she does not get out of bed. (*Id.*) He wrote that she gets dyspnea with only moderate levels of activity. (*Id.*) On examination, Dr. Green reported that Pinsky was alert, oriented, and had an intact cognitive examination. (*Id.*) Pinsky's physical examination was also unremarkable. (*Id.*)

On April 8, 2014, Dr. Jeanne Kuslis, a state agency medical consultant, reviewed the evidence in the record and opined that Pinsky could occasionally lift and/or carry up to 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk two hours in an eight-hour workday, sit about six hours in an eight-hour workday, and had unlimited pushing and/or pulling ability, "other than shown," for lifting and/or carrying. (ECF No. 16-1 at 10.) Dr. Kuslis said that Pinsky could occasionally climb ramps/stairs, never climb ladders/ropes/scaffolds, and could

occasionally balance, kneel, crouch, and crawl. (*Id.* at 10–11.) Dr. Kuslis said Pinsky should avoid concentrated exposure to extreme cold and heat as well as hazards. (*Id.* at 11.)

On April 10, 2014, Dr. Katz reported that Pinsky was again alert and fully oriented. (ECF No. 16-1 at 11.) Pinsky was neurologically intact and had full muscle strength throughout. (*Id.* at 11.)

Between April 2014 and August 2014, Pinsky underwent an extensive neuropsychological evaluation, which consisted of five separate evaluation dates, with Dr. Evan Drake. (ECF No. 16-1 at 11.) Her complex medical history included migraines, Lyme infection, chronic fatigue, depression, panic attacks, and intermittent quadraparesis. (*Id.*) Since the fall of 2013, she had experienced extreme exhaustion, insomnia, vertigo, light sensitivity, and short-term memory loss. (*Id.*) She referred to her difficulty concentrating as "brain fog" that makes it difficult for her to focus and think. (*Id.*) A victim of childhood bullying, Pinsky made a suicide attempt at age 13. (*Id.*) By high school, she had developed significant depression and anxiety that affected her attention and concentration and resulted in extensive absences. (*Id.*) She also developed a tremor in her right hand. (*Id.*) In college, she began having episodes of profound weakness. (*Id.*) A neurologist in New York concluded that these were emotionally-based. (*Id.*) After graduating from college, Pinsky worked as a temp for the company that employed her mother, but she experienced a bout of depression that forced her to quit. (*Id.*) She then began working at a law firm and reported that her anxiety increased with a heavy workload and pressure that she was receiving from a senior partner. (*Id.*) Her doctor recommended a one-month leave of absence, but, after returning to work in September 2008 for just one day, Pinsky left because she felt that her job responsibilities were untenable. (*Id.*) From May to September 2010, she attended a group treatment program three times a week at St. Vincent's Behavioral Health Holbrook—she had not had a panic attack since she

started attending these sessions. (*Id.*) In September 2010, she started a Master's program in management. (*Id.*) She worked part-time as a research assistant from September through graduation in 2013. (*Id.*) Her plan was to rest, then work part time, and then start a doctorate program, but these plans have been put on hold indefinitely due to health issues. (*Id.*, R. at 519). The report from her visits with Dr. Drake stated that Pinsky achieved a full-scale IQ of 87, placing her in the low average range and clinically significantly lower than predicted. (ECF No. 16-1 at 11, R. at 520.) Dr. Drake observed that Pinsky had no difficulty ambulating from her car, up 5 stairs, and into his office. (ECF No. 16-1 at 11–12.) He also observed that Pinsky could use her smart-phone and presented as forthright, interested, and somewhat upbeat, with a wry sense of humor during the interview and testing. (*Id.* at 12.) Pinsky's thinking was linear and logical, and she was interested and engaged during testing. (*Id.*) Her attention, concentration, and effort appeared adequate. (*Id.*) Dr. Drake concluded that Pinsky's pattern of performance is indicative of "mild frontal system inefficiencies and is entirely consistent with the effects of both depression and chronic sleep insufficiency." (*Id.*, R. at 522.) He concluded that her history, symptom presentation, and chronology are "strongly suggestive of a somatization or conversion disorder." (*Id.*)

On May 8, 2014, Dr. Nasaduke completed a medical source statement, in which she checked boxes indicating that Pinsky had poor or no ability to travel to unfamiliar places or use public transportation, to remember work-like procedures, to maintain attention for two hours segments, to maintain regular attendance and be punctual within customary usually strict tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being unduly distracted, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically-based

15

symptoms, to perform at a consistent pace without an unreasonable number of and length of rest periods, to respond appropriately to changes in a routine work setting, to deal with normal work stress, to understand and remember detailed instructions, to carry out detailed instructions, to set realistic goals or make plans independently of others, and to deal with stress of semiskilled or skilled work. (ECF No. 16-1 at 12, R. at 514–15.) Dr. Nasaduke also wrote that Pinsky had a fair ability to interact appropriately with the general public, to understand and remember very short and simple instructions, to carry out very short and simple instructions, and to accept instructions and respond appropriately to criticism from supervisors. (ECF No. 16-1 at 12, R. at 514–15.) Dr. Nasaduke indicated that Pinsky had a good ability to ask simple questions or request assistance and to get along with co-workers or peers without unduly distracting them. (ECF No. 16-1 at 12, R. 514–15.) Dr. Nasaduke also said that Pinsky had a very good ability to maintain socially appropriate behavior, to adhere to basic standards of neatness, and to be aware of normal hazards and take precautions. (ECF No. 16-1 at 12, R. at 514–15.) Dr. Nasaduke wrote that Pinsky "is totally and absolutely unable to work or study" and that she would be absent more than twice per month, but is "unable to work at all!" (ECF No. 16-1 at 12, R. at 516.)

On June 2, 2014, Pinsky had an evaluation with cardiology for fatigue and shortness of breath. (ECF No. 16-1 at 13.) She described her life as having stopped and said that she had shortness of breath intermittently and for no reason. (*Id.*) She said that she will lie in bed and have shortness of breath, which may last the whole day and is not clearly associated with exertion. (*Id.*) On examination, Dr. Thomas Nero, a cardiologist, reported that Pinsky's heart sounds were normal and that she had an appropriate mood and normal gait. (*Id.*) At this time it was noted that Pinsky's symptoms are unlikely to represent heart disease. (*Id.*)

On June 27, 2014, Dr. Nasaduke completed a home medical supplies order form in which she ordered a standard wheelchair and a lightweight wheelchair for Pinsky, due to Pinsky's mobility limitation. (ECF No. 16-1 at 8.)

In August 2014, Pinsky told Gardner, her therapist, that she had a fight with her best friend. (ECF No. 16-1 at 13.)

In December 2014, Pinsky told Gardner that she felt bullied by a classmate while she was finishing up her MBA program. (ECF No. 16-1 at 13.)

In January and February 2015, Pinsky told Gardner that she had "episodes" of paralysis. (ECF No. 16-1 at 13.) She also complained of depression and anxiety, but she denied having any panic attacks. (*Id.*) Pinsky said she attended the movies by herself in January 2015. (*Id.*)

On March 24, 2015, Dr. Nasaduke completed another medical source statement. She wrote that Pinsky has chronic fatigue disorder, Lyme disease, frequent dizziness, intermittent tremors of hands, memory deficits, depression, anxiety, insomnia, nausea, shortness of breath, fast heartbeat at times, migraine headaches, and weakness of body. (ECF No. 16-1 at 13, R. at 707.) She said that Pinsky had migraine headaches once a week and jaw spasms also once a week. (*Id.*) She had low back pain from lying in bed all the time. (*Id.*) She wrote that Pinsky is not a malingerer. (*Id.*) Dr. Nasaduke wrote that at one time Pinsky could sit for 20 minutes and could stand for five minutes. (*Id.*) She was unable to work at all because she was bedridden. (*Id.*) She wrote that Pinsky had to use an assistive device while standing or walking, that she can never lift even 10 pounds, that she was never able to twist, stoop, crouch, climb stairs or ladders, and that she had difficulty reaching, handling, and fingering. (*Id.*) Dr. Nasaduke wrote that Pinsky was incapable of even low stress work and that she would be absent from work every day. (*Id.*) Dr. Nasaduke wrote that Pinsky had to avoid all exposure to cigarette smoke, soldering fluxes, solvents and cleaners, fumes,

odors, gases, and dust. (*Id.*) Dr. Nasaduke wrote that Pinsky had appetite disturbance, decreased energy, disorientation to time, hyperactivity in the mind, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbances, difficulty thinking or concentrating, persistent disturbances of mood or affect, pressured speech, easy distractibility, persistent nonorganic disturbance of vision, speech, hearing, use of a limb, movement and its control or sensation, changes in personality, emotional withdrawal or isolation, and memory impairment. (*Id.* at 13– 14.) Dr. Nasaduke wrote that Pinsky has no useful ability to function in 30 areas of functioning, that she is extremely limited in activities of daily living and maintaining social functioning, and that she is markedly limited in maintaining attention persistence and pace. (*Id.*)

On March 30, 2015, Pinsky told Gardner that she had hot flashes, and Gardner advised her to speak to her physician. (ECF No. 16-1 at 14.) Pinsky cancelled her appointments on February 10, 2015, February 16, 2015, and March 20, 2015. (*Id.*) On April 15, 2015, Pinsky told Gardner that she danced for exercise for almost 40 minutes nonstop and that she intended to continue. (*Id.*) Pinsky cancelled therapy with Gardner on April 8, 2015, April 22, 2015, and May 29, 2015. (*Id.*)

B. Procedural History

On August 11, 2013, Pinsky filed a Title II application for a period of disability and disability insurance benefits, alleging a disability beginning on April 1, 2011. (R. at 19.) The Commission initially denied the claim on January 7, 2014, and upon reconsideration on April 8, 2014. (*Id.*) Pinsky then filed a written request for a hearing on May 20, 2014. (*Id.*) Pinsky appeared and testified at a hearing before an ALJ on June 16, 2015 in New Haven, Connecticut. (*Id.*) The ALJ denied her claim on September 17, 2015. (*Id.*) The ALJ found that Pinsky had a medically determinable impairment that was severe but that it did not meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. (R. at 22–24.) He concluded that

18

she had the residual functional capacity to do sedentary work, with several limitations. (R. at 24.) The Appeals Council denied Pinsky's appeal of the ALJ's decision on February 9, 2017. (R. at 1.) Pinsky filed this appeal of the Commissioner's final decision on March 30, 2017. (ECF No. 1.)

## II.    Legal Standard

This Court's review of the ALJ's decision is limited. The decision "may be set aside only due to legal error or if it is not supported by substantial evidence." *Crossman v. Astrue*, 783 F. Supp. 2d 300, 302–03 (D. Conn. 2010) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is less than a preponderance of the evidence, but "more than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is that amount of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* "Thus, as a general matter, the reviewing court is limited to a fairly deferential standard." *Crossman*, 783 F. Supp. 3d at 303 (internal quotation marks omitted) (quoting *Gonzalez v. Comm'r*, 360 F. App'x 240, 242 (2d Cir. 2010) (summary order)).

## III.    Discussion

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1).  To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner.[3] To be considered disabled, an individual's impairment must be "of such severity

---

[3] The five steps are as follows: (1) The Commissioner considers whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities; (3) if the claimant has a "severe impairment," the Commissioner must ask whether, based solely on the medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will

that [she] is not only unable to do [her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

The RFC "is the most [a claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ assesses a claimant's RFC based on "all the relevant evidence" in the record, including "all of [the claimant's] medically determinable impairments of which [the ALJ is] aware, including . . . medically determinable impairments that are not 'severe'. . . ." *Id*. § 404.1545(a)(2). The ALJ must "consider any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," and must consider "descriptions and observations" of the claimant's limitations, including limitations resulting from symptoms such as pain. *Id*.; § 404.1545(a)(3). The ALJ's conclusion need not "perfectly correspond with any of the opinions of medical sources cited in his decision," and the ALJ is "entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013).

Pinsky argues that the ALJ erred because he: (1) did not give controlling weight to one of Pinsky's treating physicians and one of her treating psychotherapists; (2) "cherry-picked" evidence in the record; and (3) omitted certain limitations on work ability from the RFC determination that were supported by the evidence. (ECF No. 16.)

_____

automatically consider him disabled, without considering vocational factors such as age, education, and work experience; (4) if the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has the residual functional capacity to perform his or her past work; and (5) if the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. 20 C.F.R. § 416.920(a)(4).

A.  <u>Medical Opinion Evidence</u>

First, Pinsky argues that the ALJ improperly rejected Dr. Nasaduke's and Lisa Gardner's opinions, while improperly crediting other opinions.

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature and severity of the impairment is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citation and quotation marks omitted). The Second Circuit has made clear that:

> To override the opinion of the treating physician . . . the ALJ must explicitly consider, *inter alia*: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and, (4) whether the physician is a specialist. After considering the above factors, the ALJ must comprehensively set forth his reasons for the weight assigned to a treating physician's opinion.

*Greek v. Colvin,* 802 F.3d 370, 375 (2d Cir. 2015) (internal citations, quotation marks, and alterations omitted). "The opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." *Id.* (internal citations and quotation marks omitted) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." *Schrack v. Astrue*, 608 F. Supp.2d 297, 301 (D. Conn. 2009).

The ALJ did not misapply the treating physician rule with regard to Dr. Nasaduke's opinions. Pinsky argues that the ALJ should have given Dr. Nasaduke's opinion controlling weight

because Dr. Nasaduke was Pinsky's "long-time physician" and because her opinion was consistent with Dr. Drake's later findings. (ECF No. 16-2 at 20.) But before discounting Dr. Nasaduke's opinion, the ALJ thoroughly considered the factors set out in *Greek*. The ALJ wrote that "Dr. Nasaduke's opinion is given less weight because the treating physician's assessment of the claimant's functional limitations prior to December 31, 2013 are not well supported by the objective evidence and the assessment is not consistent with the record as a whole including the claimant's activities during the relevant time-period from April 2011 through December 2013." (R. at 31.) He also found that Dr. Nasaduke's October 2013 statements about Pinsky's limitations were not credible. (R at 26, 31.)

There is substantial evidence in the record to support the ALJ's finding that Dr. Nasaduke's opinion was contradicted by the medical evidence from objective clinical tests and several of Pinsky's *other treating physicians*, namely Dr. Evangelos Xistris, Dr. Samit Malhotra, and Dr. Mikhail Magid, as well as the opinion of psychotherapist Terry Ann Gillin, and Pinsky's own testimony about her activities and abilities. (R. at 353–66 (medical history reports, showing no indication of a brain tumor or cardiovascular, neurological, or musculoskeletal difficulties), 422–23, 441–45 (tests results and report form Dr. Xistris, indicating an overall normal physical and neurological examination), 377–411, 428–446 (records of laboratory work, lumbar puncture test, and MRI's of Pinsky's brain, all of which were normal), 424–26 (Dr. Malhoptra's report of a sleep exam, recommending that Pinsky improve her sleep hygiene), 428 (results from a sleep study reporting that Pinsky slept normally), 435 (report from Pinsky's MRA, which had normal results), 423 (Dr. Xistris's report that Pinsky exhibited normal cardiac and pulmonary findings), 659 (electrocardiogram results, revealing normal sinus tachycardia and normal heart rhythm), 478–80, 484–88 (Lyme disease tests that were largely unremarkable), 51–75 (Pinsky's testimony

describing her completion of her Master's degree, part-time work, trips to Europe and Pennsylvania, driving on her own, dancing on her own, and other activities).) The ALJ also noted that Dr. Nasaduke had merely provided a checklist of her opinions, with "little to no explanation accompanying the narrative or explanation providing such relevant information as the severity or specific limiting effects and the objective findings to support those limitations." (*Id.*) And consistent with the above-quoted language from *Greek*, he further noted that Dr. Nasaduke was Pinsky's primary care physician and that she had treated Pinsky since 2010. (R. at 26 (citing R. at 373).) Therefore, the ALJ's decision not to give Dr. Nasaduke's opinion controlling weight was not error.

The ALJ also did not err by giving too little weight to Gardner's opinions or too much to Gillin's opinions. Pinsky claims that the ALJ improperly "rejected opinion evidence from therapist Lisa Gardner, while relying on very limited evidence, that does not constitute opinion evidence, from therapist Terry Ann Gillin, who saw [ ] Pinsky on only two occasions." (ECF No. 16-2 at 17.) The ALJ correctly determined that neither one of these sources was an acceptable medical source, because they are both therapists. (R. at 31–32.) Therefore, there was no requirement that the ALJ give either of their opinions controlling weight. *See Mejia v. Barnhart*, 261 F. Supp.2d 142, 148 (E.D.N.Y. 2003).

The test for how much weight is given to an acceptable non-medical source involves analyzing how well that source's opinion fits with the medical evidence. *See* 20 CFR 416.927(f). Here, the weight the ALJ gave each of the two treating therapists' opinions properly reflected the extent to which each was supported by the evidence in the record. The ALJ gave Gillin's opinion "great weight," because it was "consistent with the medical record as a whole[,] including other treating and examining sources' statements and finding[s], as well as the claimant's activities of

daily living." (R. at 31.) This decision was not error because the weight of the medical evidence indicated that the large majority of Pinsky's tests and exams returned normal results, with healthcare providers indicating that she presented as alert, responsive, and pleasant. (*See* R. at 353–66, 422–23, 441–45, 377–411, 428–446, 424–26, 423, 659, 478–80, 484–88 (medical records indicating normal results for various diagnostic tests).) By contrast, he gave Gardner's opinion "little weight," because she had "provided minimal treatment records prior to December 2013," Pinsky's date last insured, (*see* R. at 717–33), and "her opinion and statements for severe mental disability are inconsistent with the claimant's active lifestyle prior to December 2013." (R. at 31; *see* R. at 51–75 (Pinsky's testimony describing her completion of her Master's degree, her trips to Europe and Pennsylvania, driving on her own, dancing on her own, and other activities).) Although, as Pinsky points out (ECF No. 16-2 at 21), Gardner's opinion was consistent with Dr. Nasaduke's opinion, the record as a whole shows that Gardner's opinion was inconsistent with the majority of medical evidence from treating physicians and clinical tests listed above and was not thoroughly documented prior to December 2013. Therefore, it was not error to discount her opinion.

B. "Cherry-Picking" Evidence

Pinsky also argues that "[t]he evidence cherry-picked and cited by the ALJ is either irrelevant to the time period in question . . . or is a misunderstanding or understatement of [ ] Pinsky's condition, as described by her treatment providers." (ECF No. 16-2 at 27–28.) Specifically, Pinsky takes issue with the ALJ's findings that: (1) "'overall, the mild to minimal findings on objective testing suggests that claimant overestimates her physical symptoms,'" (*id.* at 25 (quoting R. at 27)); (2) the "severity of [ ] Pinsky's condition has been the same when she worked and when she alleged an onset of her disability," (*id.* at 26 (citing R. at 29); (3) Pinsky's

"activities of daily living cannot be verified" (*id.* (citing R. at 29)); and (4) Pinsky "withdrew from therapy when she got a job." (*Id.* at 27 (citing R. at 30).)

All of the findings that Pinsky disputes relate to how the ALJ weighed her own statements about her condition. For that determination, "[i]t is the function of the Commissioner, not the reviewing court to . . . appraise the credibility of witnesses, including the claimant." *Puente v. Comm'r of Soc. Sec.*, 130 F. Supp. 3d 881, 893 (S.D.N.Y. 2015) (internal quotation marks and alteration omitted) (quoting *Caroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). "The [Social Security] regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (quoting 20 C.F.R. § 404.1529(b)).

"Thus, the ALJ, after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, may decide to discredit the claimant's subjective estimation of the degree of impairment." *Id.* (internal quotation marks and alteration omitted) (quoting *Tejada v. Apfel*, 167 F.3d 770, 775–76 (2d Cir. 1999)). "The ALJ must make this determination 'in light of medical findings and other evidence[ ] regarding the true extent of the pain alleged by the claimant." *Id.* at 894 (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)). But "where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility

determination is 'generally entitled to deference on appeal.'" *Id.* at 895 (quoting *Selian v. Strue*, 708 F.2d 409, 420 (2d Cir. 2013)).

Here, the ALJ's decision is entitled to such deference because he gave a thorough explanation, based on objective evidence in the record, as to why he was discounting Pinsky's testimony. (R. at 29–30.) The ALJ did not doubt that Pinsky has a serious medical condition: he wrote that "[b]ased on the evidence of record [ ], the undersigned finds the aforementioned impairments are severe within the meaning of the regulations, as they cause significant limitations in the claimant's ability to perform basic work activities." (R. at 22.) He went on to find, however, that Pinsky was still able to perform certain types of work, despite her severe impairments. The ALJ carefully considered medical evidence from treating physicians Dr. Mikhail Magid, Dr. Evangelos Xistris, and Dr. Samit Malhotra and treating psychotherapist Terry Ann Gillin, before finding that Pinsky's symptoms were, from the objective evidence, milder than she claimed. (R. at 26–30 (noting that Dr. Malhotra "observed that the claimant appeared in no acute distress, with normal heart rhythm, normal musculoskeletal range of motion and intact neurological functioning", that Dr. Xistris "observed that the claimant appeared in no acute distress with normal gait, tandem walk, sensory and motor functioning" and that her "overall physical and neurological examination was normal," that Gillin "observed that the claimant did not appear 'sick', and exhibited a high energy level" and that Pinsky admitted that from 2011 through June 2013, she drove to college two to three times per week, worked part-time as a research assistant, traveled to Europe, cared for herself, and sustained concentration to use the computer).)[4]

---

[4] Even though Dr. Magid's observations ended before Pinsky's alleged onset date (R. at 28 (stating that Pinsky was discharged from Dr. Magid's treatment in March 2011 after she obtained a job)), his observations form part of Pinsky's medical history and aided the ALJ's understanding of the development of her condition.

Even if Pinsky's testimony, more fully credited, would support a more restrictive RFC, that would not make the ALJ's conclusion as to her RFC limitations erroneous because that conclusion was supported by substantial evidence. "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier*, 606 F. 3d at 49 (internal quotation marks omitted).

Pinsky also argues that the ALJ failed to account for variation in her condition. In *Matta*, the Second Circuit rejected a similar argument, pointing out that the record in that case supported the ALJ's conclusion that the claimant could perform some jobs in spite of fluctuating health:

> Plaintiff argues also that the ALJ's decision is inconsistent with 20 C.F.R. § 416.945(b) and (c), which provide that a claimant's RFC must reflect his ability to perform work on a "regular and continuing basis." Plaintiff argues that in determining that he was able to work, the ALJ ignored the episodic nature of bipolar disorder and cherry-picked evidence of plaintiff's "good days" without regard to the plaintiff's severely fluctuating symptoms.

> We recognize that a person suffering from bipolar disorder may be vulnerable to "violent mood swings" resulting in "better days and worse days," and that a claimant's stability on some days does not necessarily support the conclusion that he is able to work every day. Nonetheless, substantial evidence in the record supports the ALJ's conclusion that this plaintiff, with the proper treatment, could perform work on a regular and continuing basis.

> To be sure, plaintiff's condition during the period from January 2007 to January 2009 was not always stable. Plaintiff self-reported manic thoughts in July 2007, and in October 2007, after he stopped taking his medication in preparation for a computer exam plaintiff was twice hospitalized as a consequence of manic symptoms. The ALJ observed, however, that plaintiff's condition deteriorated only after he stopped taking his medication, and that his condition quickly improved with treatment. Furthermore, the ALJ pointed to numerous treatment notes made by providers at Elmhurst Hospital during the two-year period from 2007 until 2009. The treatment notes support the ALJ's conclusion that plaintiff was stable and responded well to treatment. There is substantial record evidence to support the ALJ's determination.

*Matta*, 508 F. App'x at 56–57. Pinsky similarly testified that her condition varied over time and that she had good periods and bad periods (R. at 23), but that does not negate the findings that she was able to complete Masters' program, travel to Europe, work as a research assistant, and drive by herself and that she had responded well to treatment at times during the relevant period. (R. at 25, 26, 28, 29.)

In sum, I do not find Pinsky's claim that the ALJ chose to rely on certain evidence over other, equally or more credible, evidence persuasive. Instead, I find that the ALJ carefully considered all of the evidence in the record, found that various objective measures of Pinsky's health did not match other subjective testimony, and therefore credited the objective measures over the subjective. The RFC determination was based on that substantial evidence, and the ALJ did not err by giving Pinsky's testimony less weight, even if her testimony could have supported a different determination.

### C. Residual Functional Capacity

Finally, Pinsky argues that the ALJ erred by not including certain limitations in his RFC determination. The ALJ found the Pinsky had the RFC to perform sedentary work, "except she can occasionally bend, twist, squat, crawl, kneel, balance, and climb. [Pinsky] is to avoid hazards, such as heights, vibration and dangerous machinery. [She] needs an environment free from temperature extremes and would have occasional difficulty with concentration on detailed and complex tasks." (R. at 24.)  She asserts that the ALJ should have included, based on the opinions of Dr. Nasaduke and Lisa Gardner, the following limitations in the RFC determination: (1) "Pinsky is limited in interaction with supervisors, coworkers, and the general public"; (2) "Pinsky needs frequent breaks and time away from work due to fatigue resulting in the inability to keep a regular work schedule"; and (3) "Pinsky is limited in the ability to perform even simple work tasks due to

impairments in her ability to maintain attention, memory, and concentration." (ECF No. 16-1 at 29–31.) She asserts that "[t]his case should be remanded so that the ALJ can formulate and [sic] RFC with [ ] Pinsky's actual impairments." (*Id.* at 32.)

I disagree. As I already found above, the ALJ properly gave less weight to Dr. Nasaduke's and Gardner's opinions, because Dr. Nasaduke's opinion was contradicted by other evidence and was not comprehensive and because Gardner was not a medical source and her opinion was not well documented, contradicted her treatment notes, and contradicted Pinsky's own descriptions of her activities.

Aside from Gardner's and Dr. Nasaduke's opinions and her own assertions, Pinsky only cites one other piece of evidence in support of her proposed additional RFC limitations: that, although she "engaged in intensive outpatient therapy at St. Vincent's Hallbrook" and "had good participation in groups," her "attendance was sporadic and she missed multiple scheduled treatment days due to symptoms of chronic fatigue syndrome. She reported that she was struggling to function and could not make the program consistently." (ECF No. 16-2 at 31 (citing R. at 368.)) This evidence largely depends on Pinsky's own statements about her health—which the ALJ determined were only partially credible, as discussed above—and does not overcome the medical evidence on which the ALJ relied in formulating the RFC. I find that, for these reasons, the ALJ's RFC determination was proper "based on the record as a whole." *Matta*, 508 F. App'x at 56.

## IV. Conclusion

As stated above, because the ALJ's decision was legally correct and supported by substantial evidence, I GRANT the Commissioner's motion to affirm. I DENY Pinsky's motion to reverse.

IT IS SO ORDERED.

    /s/
_____
Michael P. Shea, U.S.D.J.


Dated:       Hartford, Connecticut
              June 20, 2018